**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROSEMARY PICHURSKI,

        Plaintiff,

v.                                   CIVIL CASE NO. 06-11025
                                       HON. MARIANNE O. BATTANI

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

        Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART PLAINTIFF'S MOTION FOR JUDGMENT ON THE**
**ADMINISTRATIVE RECORD AND GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

## I.    INTRODUCTION

Before the Court are Plaintiff's and Defendant's Cross Motions for Judgment on the

Administrative Record (Doc. ## 11 & 15).  Plaintiff filed suit challenging Defendant's denial of

her application for Long-Term Disability ("LTD") Benefits.  Defendant denied Plaintiff benefits

after it concluded that she was not physically disabled to the extent that she could not work.

Plaintiff asserts that she is physically disabled by sacroiliac joint strain with right sacroiliac

malalignment ("SI strain"), from an injury that occurred when she reached for an atlas in March

1996.

## II.    STATEMENT OF FACTS

Rosemary Pichurski was born September 18, 1948.  She has an Associate's in Science

Degree and is a licensed agent in Property and Casualty Insurance.  She was hired by USF & G

in November 1995, as a Senior Underwriter and Marketer.  Her job duties included driving to

customer's premises to do site inspections, write polices, attend meetings, as well as complete documentation paperwork.

On March 8, 1996, Pichurski leaned against a chair to reach for an atlas. The chair moved, her right leg went into the air and she immediately felt pain in her back. Her symptoms worsened to the point where her last day of work was April 5, 1996.

Pichurski first saw Dr. Steven Harwood on May 23, 1996. He noted she complained of pain in the right lumbosacral region that radiated around to the groin and down the leg. Physical examination revealed severe groin and back pain and severe pain in the right lower lumbosacral region. She also had moderate tenderness to palpation over the right sacroiliac joint region. Dr. Harwood diagnosed acute, persistent, right sacroiliac joint strain with right sacroiliac malalignment. He recommended that Pichurski contact a specific therapist who specialized in SI joint proble. Admin. R. 0089-0091.

On June 17, 1996 a bone scan impression was abnormal. The findings were thoracolumbar scoliosis with findings suggestive of right SI joint sacroilitits. Admin. R. 0132. Pichurski's physical therapist noted that she had improved in nearly all areas of her therapy, and that her prognosis was "good" in both May and June 1996. Admin. R. 0257.

On September 23, 1996, Pichurski was examined by Dr. Weiss. The physical exam findings revealed no obvious deformity of the spine and hip. The claimant was observed changing positions throughout the examination. Dr. Weiss documented full range of motion of both hips, the ability of the claimant to walk on heels and toes without difficulty, and the ability to squat. Dr. Weiss concluded that Pichurski could perform full-time sedentary to light-work

activity.  Dr. Weiss also noted that his recommendation were "hindered because of Rosemary

Pichurski's lack of follow up."  Admin. R. 0470.

On October 8, 1996, Pichurski saw Dr. Young for further orthopedic consultation.  Dr.

Young noted that she exhibited

> Exquisite tenderness to even light touch to palpation of her right leg . . . even light
> touch in the pretibial area listed significant response from the patient in terms of
> withdrawal . . . gentle passive logrolling causes significant response in terms of
> grimacing and grasping of the examiner's hand, pushing it away . . . a similar
> response was elicited with light palpation over the greater trochanteric bursal area
> which is exquisitely tender to palpation.

Admin. R. 0533.  Dr. Young opined that Pichurski exhibited a "complex picture of diffuse pain,

etiology unclear."  Id.  He noted that "[t]here appears to be at least some component of emotional

overlay" in her symptoms.  Id.

On October 17, 1996, Dr. Harwood, Pichurski's treating physician, indicated a Class IV

and Class V physical impairment and a Class I and Class II mental/nervous impairment for

diagnosis of right SI dysfunction and hip pain.  Admin. R. 1302.  In his office note dated October

17, 1996, he states that the hip pain can be related to the right trochanteric bursitis or a possible

problem in the joint itself.  He indicated that it is rather difficult to diagnose and determine the

exact cause of her pain.

On January 9, 1997, Dr. Harwood stated that Pichurski had a ligament problem in her

right pelvic region and a chronic trochanteric bursitis.  He recommended that she undergo

injections at the bursa and to try to do some daily stretches.  He felt that she had reached

maximum medical improvement.  In completing a physical capacities form, Dr. Harwood stated

Pichurski would need a sit/stand option with no squatting, crawling or climbing and no lifting

over 15 pounds.  Admin. R. 1489.  On January 27, 1997, Pichurski's chiropractor, Dr. Cash,

3

assessed her physical capacity and determined that she could work part-time in a sedentary

capacity with restrictions.  Admin. R. 0481, 0484.

In March 1997, Dr. Harwood referred her to a psychologist, Dr. Roth, for "psychological

evaluation and intervention regarding her chronic back and hip pain."  Admin. R. 1540.  She

received therapy from Dr. Roth for eight sessions beginning on April 29, 1997.  Admin. R.

1526-41.  Dr. Roth's therapy centered on pain management.  Id.  His notes indicate that

Pichurski reported improvement in relaxation and stress management by the last session.

Admin. R. 1526-27.  He also noted that she was "responsive to the psychological intervention,

and it seems to have facilitated her response to physical therapy."  Admin. R. 1529.

At her June 26, 1997, visit with Dr. Harwood, Pichurski had tenderness in the lower right

sacrol region and external rotation was limited.  Dr. Harwood did not feel that she was capable

of driving regularly.  He also recommended that she continue with her physical therapy.  Admin.

R. 1424.  On September 11, 1997, Dr. Harwood again saw Pichurski.  She had been treating with

a therapist who specialized in pelvic dysfunction and malalignment problems with small

improvements.  However, on physical exam she continued to have significant SI area discomfort

and anterior innominate dysfunction.  Any attempts to put more strain on the SI region on the

right increased her discomfort.  He provided return to work restrictions of sit/stand as needed, no

repetitive bending, walk around if needed, no lifting greater than ten pounds and still unable to

drive.  Admin. R. 1422-1423.

On October 16, 1997, Cigna, the plan administrator at that time, approved Pichurski for

LTD benefits retroactive to October 1, 1996.  Admin. R. 0245.  At that time, Cigna advised her

that, consistent with the Plan, it would request periodic updates on the status of her disability and

4

that it reserved the right to have her examined by a physician of Cigna's choice.  Admin. R. 0246.

On November 6, 1997, in a letter addressed to Barbara Foster at Cigna, Dr. Harwood advised that Pichurski had completed her physical therapy but persisted to have problems in her back and pelvis area.  He stated she had a lot of features of chronic pain.  His physical exam was unchanged from pervious exams.  She continued to have numbness in her leg and tenderness in the right SI region.  From his standpoint the only treatment was for her to maintain a good home exercise program.  Admin. R. 1421.

Pichurski saw Dr. Harwood on January 8, 1998, with complaints of pain in the right SI region, right lower sacral region, right leg, and some pain into the calf with lateral right foot pain.  She was getting tingling and numbness in her leg.  Dr. Harwood stated it was a chronic condition and that it was difficult to know the exact way to have the condition go away.  He did not feel that further diagnostic testing would make a big difference.  Admin. R. 1420.

On March 5, 1998, Dr. Harwood again said  Pichurski.  He noted that she was trying to start some water exercises but was having problems with her abdomen.  On physical examination he noted tenderness in the lower SI region and the tailbone area, as well as difficulty with any forward flexion.  He scheduled further appointments on a as needed basis as he wanted the problems due to her abdomen and lower GI to be taken care of.  Admin. R. 1419.

On April 21, 1999, St. Paul Companies selected Liberty Mutual to assume management of the LTD claim, and on May 1, 1999, Liberty Life became the plan administrator under the Group Disability Risk Management Agreement.  In assessing the status of Pichurski's LTD

5

benefits, Liberty Life noted that certain treatment providers had indicated early on that she was responding to therapy and would be able to return to work eventually.  Admin. R. 1702.

On September 8, 1999, Pichurski saw Dr. Rossman, a neurologist, whose exam revealed no neurological abnormalities.  Dr. Rossman assessed her with right occipital neuralgia, with no evidence for spinal malfunction, cervical or lumbar disc herniation.  He deemed her symptoms primarily musculoskeletal in nature.  She refused steroid injections and non-asteroidal anti-inflammatory treatment.  Admin. R. 1311.

Dr. Harwood noted in December 11, 1999, that she continued to suffer from chronic pain that he felt to be very legitimate.  Admin. R. 1411.

On July 20, 2000, in a letter to Defendant, Dr. Harwood stated that she had problems with her SI joint and irritation of the sciatic nerve causing radiating right leg pain.  On physical examination, he noted marked tenderness to palpation over the right SI joint, as well as right sciatic notch tenderness.  Any internal and external rotation of the hip increased the pain severely.  His diagnosis remained chronic right SI problems, chronic pain syndrome, and chronic sciatic neurpoathy and irritation.  He stated that she was unable to work at all.  Admin. R. 1161.

On August 22, 2000, Dr. Harwood provided Pichurski with restrictions of needing a sit/stand/lay option, no pushing, pulling or reaching and to only lift ten pounds or less as tolerated.  These restrictions were more severe than those he provided in September 1997.  He also stated that Pichurski was unable to work at all.  Admin. R. 1362.  Additionally, he completed a physical capacities form at Defendant's request indicating Pichurski needed a sit/stand/walk/lie down option, no squatting, bending, kneeling, climbing or driving and no pushing, pulling, or reaching above shoulder.  Admin. R. 1360.

6

In June 2001, Liberty Life ordered an independent peer review of Pichurski's medical records. The peer review was performed by Gale G. Brown, Jr., M.D. The review was completed on June 14, 2001. Admin. R. 1305-1313. On June 14, 2001, Dr. Brown prepared a memorandum to a Paul Dwyer, MS, regarding Pichurski. Admin. R. 1305. Dr. Brown reviewed medical documentation and reached a diagnosis of right sacroiliac strain and possible right sacroiliitis based on a bone scan. Admin. R. 1305. He found no basis that precluded Pichurski from performing any sedentary occupation. Admin. R. 1306. He did not physically examine Pichurski. He ultimately concluded that there was no medical basis to preclude "Pichurski from performing the essential duties of any sedentary occupation for which she is duly qualified by training, education or experience." Admin. R. 1306.

Liberty Life provided a copy of Dr. Brown's report to Dr. Harwood for review and comment. Admin. R. 1288. On October 23, 2001, Dr. Harwood sent a letter to Defendant in response to receiving Dr. Brown's report regarding Pichurski. Dr. Harwood agreed that she started out with a right sacroiliac joint strain but pointed out that the bone scan showed some uptake in the right sacroiliac joint. This confirmed a problem in the SI joint. Admin. R. 1155. He noted she had chronic problems with the SI joint and developed radiating symptoms in the sciatic nerve distribution. As the problem dated back to 1996, Pichurski had developed chronic pain syndrome. Admin. R. 1155. Dr. Harwood was not providing regular treatment as there was nothing additional he could do other than psychological support and trying to find medications she could tolerate. He felt she was disabled. Admin. R. 1156. Dr. Harwood agreed that Pichurski's symptoms were atypical for patients with reported SI strain and stated that her symptoms were, at least in part, psychologically based. Id. Dr. Harwood noted that he had not

seen her on a regular basis because she did not respond to past treatment efforts: "I have not had

to see her on a regular basis because there is nothing more that I can do than just give her

psychological support and hopefully an occasional medicine she might be able to tolerate."

Admin. R. 1289.  Dr. Harwood again concluded that he felt Pichurski was disabled.  Id.

Pichurski continued to treat with Dr. Harwood through 2003.  Over the course of that

time her treatment consisted of additional therapy, as well as injections into the right SI region.

Her physical exam remained essentially unchanged with tenderness around the right SI region,

iliac crest region and IT band region.  Admin. R. 1153.

On May 14, 2003, based on the peer review, Liberty Life notified Pichurski that she did

not qualify for LTD benefits under the Plan, and that its decision would be retroactively applied,

effective October 16, 2001.  Admin. R. 1259-62.  Reasons for the denial were a peer review

conducted on the medical documentation in the file and a notation that the severity and duration

of the symptoms far exceeded the medical documentation in the file.  Admin. R. 1260.  Liberty

Life explained that in order to be disabled under the Plan, she would have to be incapable of

performing the functions of any occupation.  Admin. R. 1259.  Liberty Life further explained

that the findings of the peer review indicated that, based on her medical records, she would be

able to perform the duties of her occupation as Senior Underwriter, with restrictions.  Admin. R.

1260.

Pichurski appealed on July 9, 2003, and provided a letter from Dr. Harwood dated May

10, 2003.  Admin. R. 1239-1249.  On August 4, 2003, Defendant requested medical

documentation from October 16, 2001, to support her inability to work.  Admin. R. 1169.  Dr.

Harwood's medical records were provided to Defendant on August 25, 2003.  Admin. R. 1168.

8

His diagnosis remained chronic right sacroiliac dysfunction with chronic right sciatic neuropathy.  He also stated that although testing would be unremarkable her problem was severe and very debilitating.  Admin. R. 1148.

On September 4, 2003, Defendant sent a letter to Pichurski informing her that her appeal was denied because Dr. Harwood had provided no specific restrictions or limitations which would prevent her from performing the duties of her own or any other occupation.  Admin. R. 1146.  Pichurski was advised that her administrative rights had been exhausted.  Id.  This letter also indicated that she owed an overpayment to Defendant as a result of a workers' compensation claim.

During the course of her LTD claim, she applied for Social Security disability benefits on November 26, 1996.  She was denied and requested a hearing on October 3, 1997.  A hearing was held on September 23, 1998.  On November 16, 1998, an Administrative Law Judge granted a fully favorable decision finding Pichurski disabled since April 4, 1996.

## III.   STANDARD OF REVIEW

The Sixth Circuit has held that resolving ERISA actions challenging a denial of benefits on motions for summary judgment is improper.  Wilkins v Baptist Healthcare Sys., Inc., 150 F.3d 609 (6th Cir. 1998).  Rather, courts are "to conduct a 'de novo' or 'arbitrary and capricious review' based solely upon the administrative record and render 'findings of fact' and 'conclusions of law' accordingly."  Id., at 618-19.  In so doing, the district court is "confined to the record that was before the Plan Administrator.  See Perry v. Simplicity Engineering, 900 F.2d 963, 966 (6th Cir. 1990); see also Rowan, 119 F.3d at 437."  Id. at 615.

9

"In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed.2d 80 (1989), the Supreme Court stated that an administrator's decision to deny benefits is reviewed under a *de novo* standard unless the plan provides the administrator with 'discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Hoover v. Provident Life and Acc. Ins. Co., 290 F.3d 801, 807 (6th Cir. 2002). Because of the use of the disjunctive "or," if a plan provides an administrator with discretion to determine either eligibility for benefits, or discretion to construe the terms of the plan, then the administrator's decision will be reviewed under the arbitrary and capricious standard. In other words, as long as the plan grants the administrator discretion in either area, then the deferential standard will be employed. A plan administrator's decision will be upheld under the deferential arbitrary and capricious standard if that decision is "rational in light of the plan's provisions." University Hosp. v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000). "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989).

## IV.  ANALYSIS

### A.      Administrative Exhaustion

The Sixth Circuit has held that "[t]he administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit." Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 986 (6th Cir. 1991); Baxter v. C.A. Muer Corp., 941 F.2d 451, 453-54 (6th Cir. 1991). "This is the law in most circuits despite the fact that ERISA does not explicitly command exhaustion." Ravencraft v. UNUM Life Ins. Co. of Am., 212 F.3d 341, 343 (6th Cir. 2000).

10

Plaintiff submitted a written appeal on July, 9, 2003.  Defendant received her appeal, which was forwarded to a Mr. Jasper on July 22, along with a request to discuss the next appropriate steps.  According to the Plan documents, "The Administrator shall appoint a Benefits Committee of three or more persons to interpret and determine claims appeals under the Plan." Admin. R. 1105.  The Court is not aware of any evidence in the record that suggests this was done.  Defendant asserts that Pichurski never sought such an appeal.  Def.'s Br. Addressing The Applicable Standard of Review, at 4.  Nevertheless, in a September 4, 2003, letter, Liberty Mutual notified Pichurski that her administrative review rights had been exhausted, and that no further reviews would be conducted.  In other words, Defendant told Pichurski that no other appeals process was available, even though, according to the Plan documents, this was not the case.

"Although ERISA's administrative exhaustion requirement for claims brought under § 502 is applied as a matter of judicial discretion, a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate."  Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 419 (6th Cir. 1998).  "The standard for adjudging the futility of resorting to the administrative remedies provided by a plan is whether a clear and positive indication of futility can be made. . . . .  A plaintiff must show that 'it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.'"  Id. (citation omitted).  A clear indication of futility can be made in circumstances where the Administrator acts in bad faith, if the Administrator fails to take the required action on the employee's claim, or if it fails to supply the employee with the information she sought.  Back v. Danka Corp., 335 F.3d 790, 792 (8th Cir.

11

2003) (holding that although the doctrine of exhaustion of administrative remedies serves important purposes such as enabling a plan to obtain full information about a claim for benefits, to compile an adequate record, and to make a reasoned decision, those purposes are subverted when the plan fails to inform the claimant of his rights under the plan); Riggs v. A.J. Ballard Tire & Oil Co., Inc. Pension Plan and Trust, 979 F.2d 848, 1992 WL 345584, **2 (4th Cir. 1992). See also Carter v. Signode Indus., Inc., 688 F.Supp. 1283, 1288 (N.D. Ill. 1988)(holding a court may relieve claimant of exhaustion requirement if resort to plan procedures would be futile or plan administrators denied claimant meaningful access to those procedures.).  Here "a clear a clear and positive indication of futility can be made" because Defendant failed to follow the Plan's directives when deciding her claim, and denied her meaningful access to the Plan's review procedures.  See Dozier v. Sun Life Assur. Co. of Canada, 466 F.3d 532, 536 (6th Cir. 2006) ("Nor would an appeal of the waiver-of-premium claim have advanced any of the purposes of the judicially-created ERISA exhaustion requirement . . . ."); Shelby County Health Care Corp. v. S. Council of Indus. Workers Health and Welfare Trust Fund, 203 F.3d 926, 934 (6th Cir. 2000)(". . . a plan administrator must discharge its duties with respect to the plan 'in accordance with the documents and instruments governing the plan.'").  Therefore, in light of Defendant's assertions that Plaintiff's administrative remedies had been exhausted, even though under the Plan requirements they were not, the Court will not remand for Plaintiff to exhaust her administrative remedies.

**B.     The Policy Provisions Vest Discretion in Liberty Life**

Plaintiff argues that Liberty Life's decisions concerning eligibility should be reviewed *de novo* because it does not possess the authority to make a final decision regarding benefit

12

eligibility.  "In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989), the Supreme

Court stated that an administrator's decision to deny benefits is reviewed under a *de novo*

standard unless the plan provides the administrator with 'discretionary authority to determine

eligibility for benefits or to construe the terms of the plan.'"  Hoover v. Provident Life and Acc.

Ins. Co., 290 F.3d 801, 807 (6th Cir. 2002).  However, "discretion is not an all-or-nothing

proposition, such that a plan can give an administrator discretion with respect to some decisions

but not others."  Williams v. Int'l Paper Co., 227 F.3d 706, 711 (6th Cir. 2000).  "[E]ach plan

must be read in its entirety and language claimed to create the required degree of discretion must

be examined in context."  Id.  "Thus, . . . application of the highly deferential arbitrary and

capricious standard of review is appropriate only when the benefit plan gives the fiduciary or

administrator discretionary authority to determine eligibility for benefits."  Miller v. Metro. Life

Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991).   Likewise, if the plan gives the fiduciary

discretionary authority to construe the terms of the plan, then the arbitrary and capricious

standard of review will be applied to that decision.  See Williams, 227 F.3d at 711.

     In this case, the Plan Administrator is granted "discretionary authority to exercise all

powers and to make all determinations . . . in all matters entrusted to it . . . ."  Admin. R. 1104.

Plaintiff contends that because a benefits committee, and not the administrator, has final

authority to determine eligibility, the standard of review should be *de novo*.  Additionally,

Plaintiff contends that *de novo* review is proper because Defendant sent a letter dated September

15, 2000, in which it stated that all final claims decisions are rendered by St. Paul Companies

and that Liberty Mutual is claim administration services only.  Admin. R. 2391.  Plaintiff argues

that because Liberty Mutual stated that it did not make the final claims decisions, it admitted that it was not granted the requisite discretionary authority.

Plaintiff's arguments are unavailing. "When a review body fails to act and the claim is deemed denied on review, '[a] claimant's appropriate recourse is then to seek review of the denial by the district court.' . . . . However, the standard of review is no different whether the appeal is actually denied or is deemed denied." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988). "A federal court is to focus on the evidence before the trustees at the time of their final decision and is not to hold a *de novo* factual hearing on the question of the applicant's eligibility." Id.[1] Because the Plan granted the Administrator broad discretionary power to "make all determinations . . . in all matters entrusted to it . . . [,]" its decision will be reviewed under an arbitrary and capricious standard of review. Admin. R. 1104.

## C.    Defendant's Denial of LTD Benefits Was Arbitrary and Capricious.

Under the Plan at issue in this case, an employee is totally disabled if he or she suffers from a sickness or injury that "prevents the Covered Employee from doing each of the main duties of any job." Admin. R. 1102, Section 1.18. "Any job is one for which the Covered Employee is qualified by training, education or experience." Id., at 1102-03.

Plaintiff was notified via letter dated May 13, 2003, that her LTD benefits claim was denied. Admin. R. 1259. The letter stated that a peer review of the medical documentation in

---

[1] The Court is cognizant that the Sixth Circuit has called this result into question. "[T]here is undeniable logic in the view that a plan administrator should forfeit deferential review by failing to exercise its discretion in a timely manner." Univ. Hosps. of Cleveland v. Emerson Elec. Co., 202 F.3d 839, 846 (6th Cir. 2000). Nevertheless, the Daniel decision is still binding precedent in this circuit.

14

her file indicated that she would be able to perform the duties as her occupation as an insurance

underwriter, with some restrictions.  In a report prepared after the review, Dr. Brown found that:

> The claimant's severity and duration of symptoms *far exceed* the objective
> medical documentation reviewed.  In addition, there is substantial evidence for
> illness behavior in this file.  In particular, I note the following:
>
>> Lumbosacral strains, including sacroiliac strains typically improve or
>> resolve over a period of days to weeks with conservative treatment. In this
>> case, Ms. Pichurski reports absolutely no symptomatic improvement
>> despite extensive treatment including manipulative therapy, medications,
>> physical therapy, and acupuncture.  This total lack of response is highly
>> atypical for a individual with acute musculoligamentous strain, and raises
>> the possibility of illness behavior.
>>
>> I note that *shortly after the claimant's alleged injury* when evaluated by
>> Dr. Fischgrund, the claimant was observed moving easily about the room,
>> with normal passive range of motion of the right hip, and only "mild"
>> tenderness over the right trochanter. . . . .
>>
>> . . . .
>>
>> There appears to be fluctuations in the claimant's ability to abduct
>> and rotate her hips.  She has had at least 2 pelvic exams, and
>> cystoscopy, which require extreme abduction and external rotation
>> of both hips to position the legs for these exams, with no reported
>> difficulty in positioning during the procedures.  Yet, in stark
>> contrast, the claimant has demonstrated substantial restrictions in
>> hip ranged of motion on neuromusculoskeletal exams.
>
> . . . .
>
> Based on the objective medical documentation reviewed, I find no basis to assign
> any medical impairment related to this claimant's neuromusculoskeletal
> symptoms. . . . .
>
> . . . .
>
> The claimant's reported severe pain and total incapacity is not substantiated by
> the objective medical documentation reviewed.  There are many discrepancies
> noted in the records, with substantial documentation of illness behavior.  Simply
> stated, Ms. Pichurski's reported total disability and limited functional capacity is
> not substantiated by the objective medical documentation reviewed.

Admin. R. 1305-06  (emphasis in original).  Dr. Brown ultimately concluded that there was no

medical basis to preclude "Ms. Pichurski from performing the essential duties of any sedentary

15

occupation for which she is duly qualified by training, education or experience."  Admin. R. 1306.

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision."  McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003)(footnote omitted).  Moreover, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  However, "the highly deferential standard of review applicable in this case does not automatically mandate adherence to" the administrator's decision.  McDonald, 347 F.3d at 172.  The district court is obligated "to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations.  This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues."  Id.

Dr. Brown conducted a paper review on June 14, 2001, of the following records as the basis for his decision: Jeffrey Fischgrund, M.D., 4-3-96 through 5-8-96; Sewon Kang, M.D., 4-19-99;[2] Anthony Kilbane, M.D., 4-27-99; Various physical therapy records; Kwabena Appian

---

[2] Dr. Kang is a dermatologist.  Admin. R. 0718.

[sic], M.D., OB/GYN 5-20-99; through 9-27-99; Steven Harwood, M.D., 5-23-96 through

7-20-00; Howard Rossman, D.O., 9-8-99; Joe Weiss, M.D., 9-23-96 through 1-11-97;[3] Armen

Korkigian, D.O., 3-16-98 through 3-11-99; Robert Young, M.D., 10-8-96;[4] Various diagnostic

test reports; FCE reports, 3-4-97 and 3-5-97; Various statements of disability; Randy Roth,

Ph.D., 4-29-97 through 4-3-00;[5] Job description, senior underwriter; Timothy Grayson, M.D.,

4-28-98;[6] Various case management notes; Allan Mindlin, M.D., 4-7-99.  Admin. R. 1307.

Although relied upon heavily, the portion of Dr. Fischgrund's records Defendant cited in its

briefs were absent from the administrative record.[7]  Despite the absence of the cited records, the

Court did locate records from Dr. Fischgrund, which it must assume, given the limited period of

time Dr. Fischgrund treated Plaintiff, are duplicates of the records Defendant cites.

Nevertheless, even considering Dr. Fischgrund's records, he had not examined Plaintiff in

almost five years at the time of the review, tempering any conclusions he might have reached as

---

[3]  Although Dr. Brown lists Dr. Weiss's records as continuing until January 1, 1997, Dr. Weiss had only seen Pichurski once, on September 23, 1996.  Admin. R. 0470.  Despite only seeing her once, Dr. Weiss opined that Plaintiff was capable of returning to work in a sedentary capacity, even though she was not released to work at the time that he saw her, and even though she had yet to complete physical therapy that was prescribed for her.  Id.

[4] Dr. Young, an orthopedic surgeon, offered no opinion on whether Pichurski could return to work, but recommended that she see another surgeon for a consult.

[5] Again, although Dr. Brown lists Dr. Roth's records as continuing until April 3, 2000, Dr. Roth had not seen Pichurski since June 1997.  Admin. R. 0053.  Dr. Randy Roth is a clinical psychologist, and not a physician.  Admin. R. 0163.

[6] Dr. Grayson is urologist.  Admin. R. 0724

[7]  Dr. Fischgrund's records are not the only absences in the administrative record submitted by Defendant, which includes a gap spanning from 0320 - 0466.  Notably, there are also gaps in the SPD, which includes only the even pages from 1078 - 1094, even though Defendant cites at least twice, odd numbered pages in that span.

to the extent of Plaintiff's claimed limitations.  Moreover, in the records actually present in the administrative record, he made no determination regarding Plaintiff's ability to work.  <u>See</u> Admin. R. 0878 *et seq*.  In addition, the majority of records cited in Dr. Brown's review had nothing to do with her claimed disability.  Thus, Dr. Brown's review consisted mainly of Drs. Fischgrund's, Weiss's, Roth's, and Harwood's records.

After examination of the remaining opinions and records of the medical documentation in the record, the Court finds that Dr. Brown's conclusions do not comport with the "quality and quantity of the medical evidence and the opinions on both sides of the issues." <u>McDonald</u>, 347 F.3d at 172.  <u>See</u> <u>also</u> <u>Calvert v. Firstar Finance, Inc.</u>, 409 F.3d 286, 296-97 (6th Cir. 2005)(holding that plan administrator acted arbitrarily and capriciously in denying participant with back injury further LTD benefits through file review that reached contrary conclusions of neurosurgeon, thorough objectively verifiable disability determinations of Social Security Administration, and participant's treating physician).

First, in this case, numerous tests, "along with repeated physical examinations of, and discussions with, [Plaintiff] regarding her complaints of on-going pain and limitations on her mobility, led the treating physician . . . to conclude that she was unable to perform any form of work.  Pointing to the existence of objective data in the record as support, the SSA agreed with" the treating physician's opinion and determined that Pichurski was totally disabled.  <u>Id</u>., at 296. Nonetheless, Dr. Brown concluded that Plaintiff's "severity and duration of symptoms *<u>far exceed</u>* the objective medical documentation" Admin. R. 1305, that there is "no basis to assign any medical impairment related to [Plaintiff's] neuromusculoskeletal symptoms"  Admin. R. 1306, that Plaintiff's "reported severe pain and total incapacity is not substantiated by the

18

objective medical documentation" id., and that there is no basis to find that Plaintiff is "precluded from performing the essential duties or any sedentary occupation for which she is duly qualified" id.    "[T]he SSA's disability determination does not, standing alone, require the conclusion that [Defendant's] denial of benefits was arbitrary and capricious . . . ." Calvert, 409 F.3d at 295.  However, "[h]ere, the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining [Plaintiff's] medical records found, as it expressly said it did, objective support for [the treating physician's] opinion in those records." Id., at 294.  Thus, Dr. Brown's conclusions that the "severity and duration of symptoms *far exceed* the objective medical documentation" Admin. R. 1305, that there is "no basis to assign any medical impairment related to [Plaintiff's] neuromusculoskeletal symptoms" Admin. R. 1306, that Plaintiff's "reported severe pain and total incapacity is not substantiated by the objective medical documentation" id., and that there is no basis to find that Plaintiff is "precluded from performing the essential duties or any sedentary occupation for which she is duly qualified" id., does not comport with the "quality and quantity of the medical evidence and the opinions on both sides of the issues." McDonald, 347 F.3d at 172.

Next, the file review conducted by Dr. Brown was inadequate.  Ordinarily, "there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician." Calvert v. Firstar Finance, Inc., 409 F.3d 286, 297 fn 6 (6th Cir. 2005).  Thus, a plan administrator's "decision to conduct a file review rather than a physical exam" is merely one factor to consider in the overall assessment of whether the plan administrator acted in an arbitrary and capricious fashion. Id., at 295.  However, "the failure to conduct a physical examination - especially where the right to do so is specifically reserved in

the plan - may, in some cases, raise questions about the thoroughness and accuracy of the

benefits determination." Id. Moreover, "[w]here . . . the conclusions from that review include

critical credibility determinations regarding a claimant's medical history and symptomology,

reliance on such a review may be inadequate." Id., at 297 fn 6.

Based on his review, Dr. Brown reaches two conclusions. First, he concludes that all of

Pichurski's claimed limitations in range of movement and claims of pain are not the result of a

physical condition, but rather were the result of "illness behavior." Admin. R. 1306. This he

concludes despite never having met or examined Pichurski, and despite the fact that Dr.

Harwood, with a full understanding of her history and after conducting numerous physical

exams, did not reach that same conclusion. Second, Dr. Brown asserts that there was no

objective data in the record to support any restriction on her activities. This conclusion simply

does not square with the verifiable objective results of her test results, which Dr. Brown is

reluctant to acknowledge. See Admin. R. 1305. Moreover, he never directly addresses other

types of reports that tend to substantiate Plaintiff's claims. See e.g. Admin. R. 0897, Physical

Therapy Report; Admin. R. 0924 Bone Scan Report. It is also directly contrary to the

conclusions reached by Dr. Harwood and the SSA; conclusions that Dr. Brown never directly

addresses.

In light of the preceding analysis, the Court finds that Defendant acted arbitrarily and

capriciously and that its decision denying long-term disability benefits to Pichurski must be

reversed.

**V.     CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment on the Administrative Record is **GRANTED.**  It is **FURTHER ORDERED** that Defendant's Motion for Judgment on the Administrative Record is **DENIED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATED: **March 21, 2007**


**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt

Case Manager